# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DONNA R. MCGINNIS, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 12-1395 |
| | ) | |
| v. | ) | Judge Mark R. Hornak |
| | ) | |
| COMMISSIONER OF SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION

**Mark R. Hornak, United States District Judge**

Donna R. McGinnis ("Plaintiff") brings this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), seeking review of the final determination of the Commissioner of Social Security ("Defendant" or "Commissioner") denying her application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-433 ("Act"). This matter comes before the Court on cross motions for summary judgment (ECF Nos. 6, 8). The record has been developed at the administrative level. For the reasons which follow, Plaintiff's Motion for Summary Judgment will be GRANTED in part and DENIED in part. Defendant's Motion for Summary Judgment will be DENIED. The decision of the Commissioner is VACATED, and the matter REMANDED to the Commissioner for further proceedings not inconsistent with this Opinion.

## I.    PROCEDURAL HISTORY

Plaintiff applied for DIB on July 15, 2009, claiming a disability onset of March 18, 2009. (R. at 105-110, 115).[1] Plaintiff was initially denied benefits on September 8, 2009. (R. at 77-81). A hearing before Administrative Law Judge ("ALJ") Lamar W. Davis was held on

---

[1] Citations to ECF Nos. 4-2-9, the Record, *hereinafter*, "R. at __."

1

December 9, 2010, and Plaintiff testified, represented by an attorney, Karl E. Osterhout. (R. at 38-67). A vocational expert was present testified. (R. at 38-67). The ALJ issued his decision denying benefits to Plaintiff on March 3, 2011. (R. at 8-21). Plaintiff filed a Request for Review of Hearing Decision with the Appeals Council, which was denied on April 25, 2011, thereby making the ALJ's decision the final decision of the Commissioner. (R. at 1-5).

Plaintiff filed her Complaint in this Court on September 26, 2012. (ECF No. 1). Defendant filed an Answer on January 8, 2013. (ECF No. 3). Cross motions for summary judgment followed. (ECF Nos. 6, 8). The matter has been fully briefed, (ECF Nos. 7, 9, 10), and is ripe for disposition.

## II. STATEMENT OF FACTS

### A. General Background

Plaintiff was born on May 29, 1961, was forty-seven years of age at the time of her application for benefits, and was forty-nine years and nine months of age at the time of the ALJ's decision. (R. at 21, 41). Plaintiff graduated from high school. (R. at 42). From 1986 through 2009, Plaintiff worked for the U.S. Postal Service. (R. at 42-43). Initially, she worked as a letter carrier and subsequently held two different supervisory positions, until she was terminated due to problems with her knees. (R. at 42-43, 46). At the time of the hearing, Plaintiff was married and had four children. (R. at 108, 183).

### B. Physical Health History

On February 5, 2008, Plaintiff treated with Niveditha Mohan, M.D., at the UPMC Arthritis and Autoimmunity Center, reporting pain in her knees and hips. (R. at 161). Dr. Mohan diagnosed Plaintiff with "Bursitis NEC" and "Osteoarthros NOS-L/Leg," and recorded that Plaintiff had "significant lateral instability of both knees" and "also had significant tenderness to palpation over the left trochanteric bursa." (R. at 161-162). Dr. Mohan noted that

2

Plaintiff had not been taking her Flexeril medication and had been doing her quad-strengthening exercises "intermittently." (R. at 161). Dr. Mohan advised Plaintiff to continue her quad-strengthening exercises, lose weight, find a way to do water aerobics, and take her Flexeril medication. (R. at 162). On June 17, 2008, Dr. Mohan examined Plaintiff and noted that Plaintiff was still experiencing pain and her sleep had improved "minimally." (R. at 166). Although Plaintiff was regularly taking Flexeril and doing her quad-strengthening exercises, her knee pain had progressed, which limited her activities. (R. at 166). Plaintiff was "very tearful during the visit and kept insisting on getting her knees replaced." (R. at 166). She reported that she could not work forty hours per week and could only work thirty-two hours per week. (R. at 166). Dr. Mohan diagnosed Plaintiff with the same conditions and advised her to follow the same instructions that she received at her last visit, adding that she should reduce her hours at work to thirty-two hours per week "when her pain is worse or flaring." (R. at 166-167).

On July 3, 2008, Adolph J. Yates, M.D., reviewed an MRI with Plaintiff and recommended that she get an opinion from spine physiatrist Marc J. Adelsheimer, M.D. (R. at 172). On July 14, 2008, Dr. Adelsheimer examined Plaintiff for a Rehabilitation and Pain evaluation. (R. at 182). Plaintiff complained of low back and bilateral knee pain and Dr. Adelsheimer diagnosed Plaintiff with having "degenerative arthritis of the knees" and an "annular tear, L4-5 disc, with questionable radicular symptoms." (R. at 182-183). Plaintiff reported that she was employed by the U.S. Post Office but was not currently working, and said she exercised and did some leg lifts. (R. at 182-183). Dr. Adelsheimer scheduled Plaintiff for a series of "bilateral L4 transforaminal epidural steroid injections." (R. at 178, 180, 183). Plaintiff reported there were no side effects from the first series of injections, which she said "helped her a lot" and made her feel "about 65-70% better." (R. at 180). On August 26, 2008, Plaintiff met with Dr. Adelsheimer following her second series of injections, and reported that she had no side

3

effects, was "very pleased," felt "100% better and [was] pain free." (R. at 178). Dr. Adelsheimer gave Plaintiff permission to stop taking Flexeril, which she had been using occasionally. (R. at 178).

On September 5, 2008, Plaintiff was examined by chiropractor Philip J. Olverd, D.C., R.D. (R. at 197). Dr. Olverd opined that Plaintiff could not return to work until further notice. (R. at 197). Plaintiff underwent physical therapy at Dr. Olverd's facility, Spine & Sports Injury Rehabilitation Center, from September 2008 through August 2009. (R. at 203-256). In 2008, Plaintiff attended ten (10) physical therapy sessions in September, twelve (12) sessions in October, and one (1) session in November. (R. at 207-211, 232-256). In 2009, Plaintiff attended two (2) physical therapy sessions in February, two (2) sessions in March, four (4) sessions in April, two (2) sessions in May, four (4) sessions in June, and two (2) sessions in August. (R. at 216-231). Plaintiff's reported level of pain varied throughout the duration of her physical therapy treatment. During many of these sessions, Plaintiff reported that she was feeling "achy" and sore, but during several other sessions, Plaintiff reported her knees and legs were feeling good and felt like she was making progress. (R. at 216-256). On February 14, 2009, Dr. Olverd released Plaintiff to return to work. (R. at 202). On March 17, 2009, Plaintiff was terminated from her job[2] and alleged onset of disability the following day, but at her next physical therapy session on March 30, 2009, she reported that she had been working full-time since February 14, 2009. (R. at 46, 115, 118, 228).

On May 6, 2009, Dr. Yates examined Plaintiff for a follow-up visit and gave her a Derpo-Medrol injection in her right knee, which Plaintiff later reported "didn't really do anything." (R. at 170, 223). Dr. Yates' notes provide that Plaintiff "had a great deal of help from Dr.

---

[2]  Plaintiff stated at the administrative hearing that she was terminated from her job due to problems with her knees. (R. at 45-46). She reported to multiple treating physicians that her condition made her unable to do her job, which required prolonged walking and standing. (R. at 269, 273).

4

Adelsheimer with a series of injections," but she was "having some return of knee pain on the right with radiation proximally in and around the thigh and also pain radiating into her left leg down her calf." (R. at 170). On May 12, 2009, Plaintiff was examined by Dr. Adelsheimer for a follow-up visit, who noted that he had not seen Plaintiff since August of 2008. (R. at 176). Plaintiff stated that her pain was "returning and getting worse," and Dr. Adelsheimer recommended "repeating the bilateral L4 transforaminal epidural injections" because they "did help her a lot in the past." (R. at 176-177).

On June 2, 2009, Edward D. Snell, M.D., evaluated Plaintiff and diagnosed her with "bilateral moderate to severe bilateral knee arthritis," "multiple degenerative joint disease including wrist and elbows," and "low back pain." (R. at 190). Regarding Plaintiff's multiple joint pains, Dr. Snell noted that "the patient is fairly well controlled and will continue her current medications that she is on including Darvocet, Neurontin, and Flexeril, as per her PCP." (R. at 191). Dr. Snell's notes provide that Plaintiff's bilateral knee pain had "become more symptomatic" and that her physical therapy treatment has resulted in "some improvement in strength and function, however, the pain has not subsided." (R. at 190). On June 5, 2009, Plaintiff had an MRI of the lumbar spine, which was "unremarkable." (R. at 192).

Plaintiff went on a five day vacation in June of 2009 and upon her return to her physical therapy treatment, she reported that "her knees didn't bother her as much as before she went on her trip," but since she returned her "knees [were] more sore." (R. at 218-219). Plaintiff stated that she did golf ball exercises every morning and rode a bicycle, which she said "helped." (R. at 218). When her knees bothered her on the trip, she "got in the water above her knees which made a difference." (R. at 218). On June 24, 2009, she assessed her pain level as a nine out of ten in her right knee, and a five out of ten in her left knee. (R. at 217). Plaintiff reported she had been pulling weeds in her garden and was "sore all over." (R. at 217).

5

On July 6, 2009, Dr. Snell gave Plaintiff a Synvisc injection. (R. at 189). On July 13, 2009, Plaintiff met with Dr. Snell for a follow-up visit and reported that the Synvisc injection had "not helped her, in terms of pain," and she requested trying Platelet Rich Plasma ("PRP") treatment. (R. at 188). On July 29, 2009, Plaintiff received PRP injections in both of her knees from Dr. Snell, and at a follow-up visit on August 25, 2009, Dr. Snell noted that Plaintiff was "really not a whole lot better at this point" and was still having "pain all the time." (R. at 187-188, 216, 257-258).

On September 8, 2009, non-treating state agency physician Darren Gallaher conducted a physical residual functional capacity assessment of Plaintiff and opined that Plaintiff had medically determinable impairments of osteoarthritis of the knees and fibromyalgia. (R. at 74). Dr. Gallaher determined that Plaintiff could stand and/or walk for at least two hours in an eight-hour day, and could sit for a total of about six hours in an eight-hour day. (R. at 70). Dr. Gallaher wrote that "despite ongoing treatment, [Plaintiff] continues to have pain which significantly impacts on her ability to perform work related activities," and found her statements regarding her symptoms to be "partially credible," based on the evidence of record. (R. at 74).

On September 23, 2009, Plaintiff was examined by Elizabeth A. Young, M.D., for the purpose of determining "how to deal with the pain." (R. at 273-276). Plaintiff said she believed that the PRP injections performed by Dr. Snell in July 2009 "may have had some benefit." (R. at 273). Dr. Young's notes provide that Plaintiff "had severe back spasms at work in March 2009" and Plaintiff reported to Dr. Young that she was "terminated because she cannot perform the duties of her job which involves prolonged standing and walking." (R. at 273). Plaintiff stated she was "contesting her dismissal" and had not worked since July 4, 2009. (R. at 273). Dr. Young diagnosed Plaintiff with "degenerative joint disease, knees" and "generalized fibromyalgia." (R. at 276). In a letter addressed to Plaintiff's counsel, Dr. Young opined that

based on the information she had, it was "reasonable to conclude...that [Plaintiff] would have difficulty doing continuous, prolonged weight bearing activity." (R. at 271).

On November 3, 2009, Plaintiff was examined by Ryan J. Soose, M.D., on referral from Dr. Young, regarding her "difficulty staying asleep." (R. at 284). Plaintiff said that she was "waking up frequently at night for the past year primarily because of knee pain and generalized body pains." (R. at 284). The sleep study identified no apnea and Dr. Soose "felt her sleep disorder was psychophysiologic." (R. at 272). On January 5, 2010, Plaintiff reported to Dr. Young that she was feeling better overall, and said that taking "Prozac 20 mg each morning did help her cope better with her musculoskeletal discomfort." (R. at 272). Dr. Young advised Plaintiff to "continue breathing exercises and easy yoga," take a warm bath at bedtime, continue treating with her psychologist, and walk for exercise. (R. at 272). Dr. Young recommended that Plaintiff walk for ten minutes, rest for five minutes, and walk back home for ten minutes, and should attempt "to increase endurance by increasing pace or duration every 2 to 3 weeks." (R. at 272).

On May 27, 2010, Plaintiff had MRIs of both of her knees, which were reviewed by Arnold J. Snitzer, M.D. (R. at 264-267). Dr. Snitzer found that Plaintiff's right knee had "advanced degeneration of the lateral meniscus with Grade 4 Chondrosis of the lateral compartment," "superficial Grade 1 Chondrosis of the patellofemoral compartment," and "small effusion." (R. at 264-265). Dr. Snell found Plaintiff's left knee had "Grade 4 Chondrosis of the lateral and patellofemoral compartment," "myxoid degeneration of the lateral meniscus," and "small effusion." (R. at 266-267). On August 25, 2010, Dr. Snell examined Plaintiff for a follow-up visit, and Plaintiff was still experiencing pain and having "difficulty getting around." (R. at 257). Dr. Snell's notes state that "we tried Synvisc, cortisone, PRP, relative rest, anti-inflammatories, [and] pain medications," but "nothing is really helping at this point." (R. at 257).

7

## C. Mental Health History

Plaintiff treated with clinical psychologist Karen J. Schulze, Psy.D., for two months, beginning on September 2, 2009. (R. at 268-270). At the initial session, Dr. Schulze evaluated Plaintiff and diagnosed her with "major depression, recurrent, severe" and alcohol abuse. (R. at 269-270). Plaintiff reported taking Darvocet and Flexeril. (R. at 269). She had not been taking Percocet because it gave her a "foggy feeling" and had not been taking Lyrica because it was "hard on her stomach." (R. at 269). Plaintiff reported that she used alcohol "to cope with the pain," and would drink "a small glass of unknown quantity of liquor three to five times a week." (R. at 269). She agreed to start measuring "the number of shots in her drinks" because she did not think she could quit using alcohol at that time. (R. at 269). At Plaintiff's next session on September 10, 2009, she reported "a change in attitude" and had "resolved to live life as fully as she can," which she did by "inviting friends over, and taking on new projects." (R. at 268).

Plaintiff was next scheduled to see Dr. Schulze on September 17, 2009, but she cancelled her appointment on that day because she was experiencing pain. (R. at 268). At her rescheduled appointment on September 24, 2009, "cognitive/motivational therapy was used to address her need to safer means of sleep than through the use of alcohol." (R. at 268). On October 1, 2009, Plaintiff and Dr. Schulze completed and signed a treatment plan, and Dr. Schulze noted that Plaintiff had "already radically reduced her drinking, and her efforts were reinforced." (R. at 268). Plaintiff did not show up to her next scheduled appointment on October 15, 2009. (R. at 268). On October 22, 2009, which was Plaintiff's last session, Dr. Schulze used "cognitive/motivational therapy" to address Plaintiff's "challenges with coming to terms with her history of feeling unloved." (R. at 268). Plaintiff reported that she was taking Lyrica at night and was taking Darvocet "for extreme pain on occasion." (R. at 268). Plaintiff cancelled her appointment on October 29, 2009 and never showed up to the rescheduled appointment on

November 5, 2009. (R. at 268). Ten months later on September 7, 2010, Plaintiff called Dr. Schulzes' office, requesting her treatment records for her DIB hearing. (R. at 268).

### D.    Administrative Hearing

On December 9, 2010, Plaintiff testified at her administrative hearing, represented by counsel. (R. at 38-67). She was born on May 29, 1961, making her forty-nine years and seven months old at the time of the hearing. (R. at 41-42). Plaintiff was a high school graduate and worked for the U.S. Postal Service from 1986 through 2009. (R. at 42). Plaintiff began her career as a letter carrier and subsequently held two separate supervisory positions. (R. at 42). Plaintiff testified that she had Grade IV Chondrosis since she was a teenager and this condition worsened over time.[3] (R. at 44). On February 14, 2009, Plaintiff's position at work was changed to plant supervisor, which required her to stand on her legs more, making her condition worse. (R. at 44). Her day usually involved about three hours of desk work and the remaining five hours were spent supervising the staff. (R. at 43). Plaintiff said that her leg began "flaring up" and was "swelling and aching." (R. at 44). Plaintiff described her Grade IV Chondrosis as "basically bone-on-bone" grinding every time she walked, and was ultimately terminated as a result of her problems with her knees. (R. at 45-46). She did not feel that her termination was justified. (R. at 46-47). She said she was "unable to do the job" so she asked whether she could work only two to three days per week, but was told her condition was too severe. (R. at 46-47).

Regarding treatment, Plaintiff stated she had participated in both physical therapy and occupational therapy, and had also been seen chiropractors. (R. at 45). She took Prozac, Flexeril, Neurontin, and Ultram, and said the combination of these medications made her sick, so she stopped taking "some of them," including Prozac. (R. at 48, 56-57). Moreover, she maintained that the medication made it difficult for her to concentrate, making her "very drowsy

---

[3] The condition was transcribed as "Grave IV Chondrosis," but Plaintiff's medical records demonstrate it is appropriately named Grade IV Chondrosis. (R. at 43, 45, 195, 264-267).

and sleepy." (R. at 56). Plaintiff said her medications were not improving her situation and felt her doctor would agree with that statement. (R. at 48). She testified that she tried Hyalgan injections, Synvisc injections, cortisone injections, and PRP injections, but said none were successful. (R. at 49). Plaintiff stated that she was referred to Dr. Michael Seel, who scheduled her for a total knee replacement on October 18, 2010. (R. at 49).

The ALJ asked Plaintiff whether it was ever recommended that she try to get exercise by walking. (R. at 49). Plaintiff initially responded in the negative, stating that "the walking would have to be only minimal because of the bone-on-bone scraping." (R. at 49-50). However, she also said in order to "keep the muscle around the knee strong," she would walk for ten to fifteen minutes and rest for a half hour, or she would attempt to walk backwards up the stairs. (R. at 50). She testified that such walking was recommended daily. (R. at 50). Then the ALJ specifically asked her about Dr. Young's instruction that she try to walk for ten minutes, rest for five minutes, and walk back home for ten minutes. (R. at 50). Plaintiff said that she tried doing it and "sometimes it would be good" and made her feel better, but other times she was unable to do it. (R. at 50). Plaintiff said she returned to see Dr. Young six months following this recommendation and Dr. Young told her to do what she could. (R. at 51).

Plaintiff testified that she experienced pain in her elbows and wrists and was told she had traumatic ganglion. (R. at 51-52). She had trouble making fists sometimes, mainly in her left hand, so she held her cane with her right hand despite being left-handed. (R. at 52). Plaintiff had full range of motion in her shoulders and hips, but her hips were sometimes stiff. (R. at 53). She said that her knees were constantly swollen and her ankles would also swell if she was "on them too long." (R. at 53-54). She stated that Dr. Yates told her that "a lot of her discomfort and inability to walk" was a result of "deterioration in [her] lower back." (R. at 52).

10

With respect to daily activities, Plaintiff said her knees prevented her from being able to scrub the floor. (R. at 54). She testified that she tried sit if she did yard work. (R. at 54). She said she could not do activities around the house for more than an hour and a half. (R. at 58). When asked by the ALJ if she ever rode a bicycle, she said "no, I do not." (R. at 54-55). The ALJ specifically asked her about riding a bicycle on vacation and she said it was possible that she did this, but did not recall doing so. (R. at 55). She remembered that the golf ball exercises she did on vacation helped and said she got in the water above her knees to "loosen it up." (R. at 55). Plaintiff stated she was "working" on her emotions and was trying to get out more. (R. at 56). When asked by the ALJ if there was anything that she's had to stop doing, she responded that she had "pretty much stopped everything." (R. at 56).

Plaintiff said she would have a "bad day" about three days per week, which she defined as when her pain level was a ten out of ten. (R. at 58-59). On such days, she said she would "just try to relax and do mindful reading and small exercises in the bed." (R. at 58). On days that were not "bad days," she said that instead of laying down, she would sit, and try to do something like computer work or relaxing. (R. at 60). In the last thirty days, she said had more bad days because of the surgery, and was "just in an awful lot of pain." (R. at 61). She said that following her termination with the U.S. Postal Service in March of 2009, she would on average have at least four bad days per week and maybe three better days. (R. at 61). Then, she testified that she had not "had a good day in a while." (R. at 61).

Following Plaintiff's testimony, the ALJ questioned the vocational expert. (R. at 62-65). The ALJ first asked the vocational expert to characterize Plaintiff's past work for the post office. (R. at 62). The vocational expert testified that Plaintiff's work as a letter carrier was characterized as medium and unskilled work, and regarding her work as a supervisor in the two

separate positions, one was considered semi-skilled work and light work, and the other was skilled and light work. (R. at 62). The ALJ then asked the vocational expert to assume a:

> hypothetical individual of the same age, education, background, and vocational history as depicted in this record, which individual would be capable of no more than light exertional activity, provided a discretionary sit-stand option were afforded. In addition, this hypothetical individual would be precluded from all but occasional postural adaptation, which would be stoop, kneel, crouch, crawl, balance, or climb, with no exposure to hazards such as unprotected heights or dangerous machinery, and mentally would be limited to simple, routine, repetitive tasks involving incidental exercise of independent judgment or discretion. No more than incidental change in work processes. No piece work, production rate pace and no interaction with the general public. Incidental will be defined at all times in this hearing as totaling up to but not more than one-sixth of a routine eight-hour work day. In light of that, would this hypothetical individual in your estimation be capable of performing any of the claimant's past relevant work?

(R. at 62-63). The vocational expert responded in the negative. (R. at 63). The ALJ next asked the vocational expert whether there were any transferable skills acquired in past relevant work applicable to this hypothetical individual, to which the vocational expert also responded in the negative. (R. at 63). The vocational expert then opined that such an individual could perform assembly work, with 36,000 such jobs available nationally, work as a packer, with 25,000 such jobs available, or work as a sorter-grader, with 19,000 such jobs similarly available. (R. at 63-64).

The vocational expert testified that such a hypothetical individual could not maintain work if that individual was absent an average of four days per month in an ongoing fashion. (R. at 64). The vocational expert then explained that his testimony did not comport with the criterion set forth in the Dictionary of Occupational Titles ("DOT") because the DOT "does not speak of the sit-stand option." (R. at 65). The vocational expert said that "the numbers are based

on reductions formed by [himself] and other vocational experts in the field," but otherwise said his testimony was consistent with the DOT. (R. at 65).

Plaintiff's attorney next questioned the vocational expert, and asked what amount of standing and walking such a hypothetical individual would be required to do in the three jobs listed by the vocational expert in an eight-hour day. (R. at 65). The vocational expert said that there would be no walking required, and there was also no minimum standing requirement because the jobs could be accomplished just as easily by either sitting or standing. (R. at 66-67). Plaintiff's attorney next asked the vocational expert what an average employer expected regarding attendance, and what an average employer expected regarding on-task requirements. (R. at 67). The vocational expert answered that one absence per month was acceptable, and an average individual must be on-task ninety percent of the time, respectively. (R. at 67).

### E.    Administrative Decision

In his written decision dated March 3, 2011, the ALJ concluded that Plaintiff had not been under a disability within the meaning of the Act at any time since her alleged onset of disability. (R. at 12). The ALJ determined that Plaintiff had the following severe impairments: epicondylitis (commonly known as tennis elbow), Grade IV Chondrosis, osteoarthritis of the hips and knees, depressive disorder, and alcohol abuse. (R. at 14). As a result of said impairments, the ALJ concluded that

> [Plaintiff] has the residual functional capacity to perform light work defined in 20 CFR 404.1567(b) except: occasional stooping, kneeling, crouching, crawling, balancing, and climbing; avoid all exposure to hazards, including unprotected heights and dangerous machinery; requires the option to sit or stand at will; and, requires simple, routine and repetitive tasks that involve only incidental use of independent judgment or discretion, no piece work or production rate pace and no interaction with the general public.

(R. at 16). In assessing Plaintiff's residual functional capacity ("RFC"), the ALJ stated "there is no doubt that the claimant experiences pain from bilateral, moderate knee osteoarthritis, however, the alleged extent of her pain and resulting limitations do not match her activities." (R. at 17). The ALJ discussed several of Plaintiff's inconsistent statements and found they "tend[ed] to lessen her credibility in general." (R. at 17-18). The ALJ found that because Plaintiff disagreed with the decision to terminate her, it was an assertion that she was capable of performing work that is light in exertion. (R. at 18). The ALJ also discussed Plaintiff's daily living activities in determining that her pain was not as severe as she claims. (R. at 18). Additionally, the ALJ considered the opinion of Plaintiff's treating rheumatologist Dr. Young and concluded that his assessment of Plaintiff's RFC was "not inconsistent" with Dr. Young's opinion. (R. at 18).

Based upon the testimony of the vocational expert, the ALJ determined that Plaintiff was capable of engaging in a significant number of jobs in existence in the national economy. (R. at 19-21). Plaintiff was not, therefore, awarded DIB. (R. at 21).

### III.    STANDARD OF REVIEW

To be eligible for Social Security benefits under the Act, a claimant must demonstrate to the Commissioner that he or she cannot engage in substantial gainful activity because of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least twelve months. 42 U.S.C. § 423(d)(1)(A); Brewster v. Heckler, 786 F.2d 581, 583 (3d Cir. 1986). When reviewing a claim, the Commissioner must utilize a five-step sequential analysis to evaluate whether a claimant has met the requirements for disability. 20 C.F.R. §§ 404.1520, 416.920.

The Commissioner must determine: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or a

14

combination of impairments that is severe; (3) whether the medical evidence of the claimant's impairment or combination of impairments meets or equals the criteria listed in 20 C.F.R., Pt. 404, Subpt. P, App'x 1; (4) whether the claimant's impairments prevent him from performing his past relevant work; and (5) if the claimant is incapable of performing his past relevant work, whether he can perform any other work which exists in the national economy. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); see Barnhart v. Thomas, 540 U.S. 20, 24–25, 124 S.Ct. 376, 157 L.Ed.2d 333 (2003). If the claimant is determined to be unable to resume previous employment, the burden shifts to the Commissioner (Step 5) to prove that, given claimant's mental or physical limitations, age, education, and work experience, he or she is able to perform substantial gainful activity in jobs in the national economy. Doak v. Heckler, 790 F.2d 26, 28 (3d Cir. 1986).

Judicial review of the Commissioner's final decisions on disability claims is provided by statute, and is plenary as to all legal issues. 42 U.S.C. §§ 405(g)[4], 1383(c)(3)[5]; Schaudeck v. Comm'r of Soc. Sec., 181 F.3d 429, 431 (3d Cir. 1999). Section 405(g) permits a district court to review the transcripts and records upon which a determination of the Commissioner is based; the court will review the record as a whole. *See* 5 U.S.C. § 706. The District Court must then

---

[4] Section 405(g) provides in pertinent part:

> Any individual, after any final decision of the [Commissioner] made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action ... brought in the district court of the United States for the judicial district in which the plaintiff resides, or has his principal place of business.

42 U.S.C. § 405(g).

[5] Section 1383(c)(3) provides in pertinent part:

> The final determination of the Commissioner of Social Security after a hearing under paragraph (1) shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title.

42 U.S.C. § 1383(c)(3).

determine whether substantial evidence exists in the record to support the Commissioner's findings of fact. Burns v. Barnhart, 312 F.3d 113, 118 (3d Cir. 2002).

Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate" to support a conclusion. Ventura v. Shalala, 55 F.3d 900, 901 (3d Cir. 1995) (quoting Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971)). If the Commissioner's findings of fact are supported by substantial evidence, they are conclusive. 42 U.S.C. § 405(g); Richardson, 402 U.S. at 390. A District Court cannot conduct a *de novo* review of the Commissioner's decision nor re-weigh the evidence of record; the court can only judge the propriety of the decision in reference to the grounds invoked by the Commissioner when the decision was rendered. Palmer v. Apfel, 995 F. Supp. 549, 552 (E.D. Pa. 1998); S.E.C. v. Chenery Corp., 332 U.S. 194, 196–97 (1947). The court will not affirm a determination by substituting what it considers to be a proper basis, Chenery, 332 U.S. at 196–197. Further, "even where this court acting *de novo* might have reached a different conclusion ... so long as the agency's fact finding is supported by substantial evidence, reviewing courts lack power to reverse either those findings or the reasonable regulatory interpretations that an agency manifests in the course of making such findings." Monsour Medical Center v. Heckler, 806 F.2d 1185, 1190–1091 (3d Cir. 1986).

## IV.   DISCUSSION

Plaintiff objects to the decision of the ALJ, arguing she established by a preponderance of the evidence that she is incapable of "light work." (ECF No. 7 at 5-7). Moreover, Plaintiff asserts that the ALJ erred in determining Plaintiff's RFC by failing to quantify the precise amount of time allotted between sitting and standing/walking. (ECF No. 7 at 7-11). Plaintiff further argues that the ALJ improperly applied the Medical Vocational Guidelines ("Grids" or "Grid Rule"), 20 C.F.R., Pt. 404, Subpt. P, App. 2, mechanically in a "borderline situation,"

improperly weighed the medical opinion of Dr. Young, improperly assessed Plaintiff's credibility, and that the totality of his errors led to an improper hypothetical question posed to the vocational expert. (ECF No. 7 at 11-19). Defendant counters that the ALJ's finding that Plaintiff could perform a modified range of light work is supported by substantial evidence, and the ALJ properly determined Plaintiff's RFC, properly weighed Dr. Young's medical opinion, properly analyzed Plaintiff's credibility, and provided the testifying vocational expert with an appropriate RFC and corresponding hypothetical question. (ECF No. 10 at 2-11). Except as to the ALJ's assessment of Plaintiff's credibility, the Defendant is correct.

Plaintiff first argues that based on her testimony, which she contends was supported by her treating rheumatologist Dr. Young, she established by a preponderance of the evidence that she is incapable of "light work," which would require her to be on her feet for approximately six hours of an eight hour day. (ECF No. 7 at 5-7). A full range of light work requires that a claimant is able to stand or walk, off and on, for a total of approximately six hours in an eight-hour day. 20 C.F.R. § 404.1567; S.S.R. 81-10, 1983 WL 31251, *6. However, the ALJ did not assess Plaintiff an RFC with a full range of light work, and instead provided the limitation that she be able to sit *or* stand at will. (R. at 17-21). Although Plaintiff argues that her position is supported by the opinion of her treating rheumatologist Dr. Young, the ALJ considered Dr. Young's opinion and concluded that it was "not inconsistent with [Plaintiff's RFC] assessment, which allows for the sit/stand option." (R. at 18, 271). The vocational expert testified that the option to sit or stand at will would require no walking during the day, and that Plaintiff would only have to stand if she desired. (R. at 66-67). Accordingly, there is no error here.

Plaintiff next argues that the ALJ erred because his RFC assessment of Plaintiff lacked the necessary specificity required by Rulings 83-12 and 96-9p. (ECF No. 7 at 7-9). Plaintiff asserts that this alone was error because it prevented the ALJ from meeting his burden at Step 5

of the sequential analysis. (ECF No. 7 at 7-11). Further, Plaintiff contends that the ALJ's imprecise RFC created a "borderline situation" because at the time of his decision, Plaintiff was only a few months away from turning fifty years old.[6] (ECF No. 7 at 8-11). The Court disagrees.

"Where an individual's exertional RFC does not coincide with the definition of any one of the ranges of work as defined in sections 404.1567 and 416.967 of the regulations, the occupational base is affected," but "[t]here are some jobs in the national economy...in which a person can sit or stand with a degree of choice." S.S.R. 83-12, 1983 WL 31253, *2, *4. If an individual is capable of performing such a job, she would not be found disabled. Id. at *4. "In cases of unusual limitation or ability to sit or stand, a [vocational specialist] should be consulted to clarify the implications of the occupational base." Id. Further, Ruling 96-9p provides that the "RFC must be specific as to the frequency of the individual's need to alternate sitting and standing," but this Ruling only applies to situations when a claimant's RFC is assessed as less than a full range of sedentary work. S.S.R. 96-9p, 1996 WL 31253, *7. In such cases, "it may be especially useful...to consult a vocational resource in order to determine whether the individual is able to make an adjustment to other work." Id. The ALJ found Plaintiff to be capable of less than a full range of light work (and not less than a full range of sedentary work), so Ruling 96-9p is not applicable. (R. at 16). Nonetheless, other jurisdictions have held that similar limitations to the RFC in this case have satisfied the specificity required in Ruling 96-9p. See, e.g., Ketelboeter v. Astrue, 550 F.3d 620, 626 (7th Cir. 2008)(an RFC specifying that claimant be able to alternate between sitting and standing "as needed during the day" was sufficient); Hodge v. Barnhart, 76 F. App'x. 797, 800 (9th Cir. 2003)(Although Ruling 96-9p

---

[6] An individual is considered a "younger person" if she is under the age of fifty. 20 C.F.R. § 404.1563. An individual is considered a "person closely approaching advanced age" if her age is between fifty and fifty-four years old. Id.

applies to sedentary work and does not apply to light work, the ALJ's hypothetical to the vocational expert sufficiently set forth all limitations and restrictions of claimant when it included "the option to sit or stand").

Here, the ALJ received testimony from a vocational expert, who opined that a hypothetical individual with Plaintiff's RFC, age, education, and vocational experience could perform jobs that existed in significant numbers in the national economy that were light in exertion with an option to sit or stand at will. (R. at 63-64). Upon questioning from Plaintiff's counsel, the vocational expert explained that the jobs listed could be accomplished just as easily while either sitting or standing, subject to Plaintiff's discretion. (R. at 65-66). As a result, the ALJ's assessment of Plaintiff's RFC did not lack the specificity required in Rulings 83-12 and 96-9p.

With respect to Plaintiff's argument that a "borderline situation" is present, such a situation exists when a claimant is "within a few days to a few months of reaching an older age category, and using the older age category would result in a determination or decision that [the claimant is] disabled." 20 C.F.R. § 404.1563. If there is a borderline situation, then the ALJ must not apply the Grids mechanically. Id. In this case, there is not a borderline situation and the ALJ did not apply Grid Rule 202.21 mechanically. Plaintiff was only a few months away from approaching her fiftieth birthday at the time of the ALJ's decision. (R. at 21, 41). When a claimant turns fifty years old, her age category changes from a "younger person" to a "person closely approaching advanced age." 20 C.F.R. § 404.1563. Plaintiff contends that an outcome determinative situation is present because if Grid Rule 201.12 would have been applied instead of Grid Rule 202.21, she would have been found disabled. (ECF No. 7 at 10). However, application of Grid Rule 201.12 requires not only adjusting Plaintiff's age, but also requires reducing her exertional level from light to sedentary work. 20 C.F.R., Pt. 404, Subpt. P, App. 2,

§ 201.12. The ALJ did comply with Rulings 83-12 and 96-9p in determining Plaintiff's exertional level, so Grid Rule 201.12 is inapplicable. Moreover, even if a borderline situation actually existed, the ALJ still did not err here because he did not apply Grid Rule 202.21 mechanically, and instead used it as "a framework." (R. at 19-20). The ALJ explained that because Plaintiff did not have the RFC "to perform all or substantially all of the requirements" of the full range of light work, it would be inappropriate to apply the Grids mechanically. (R. at 20). Consequently, the ALJ sought testimony from a vocational expert "to determine the extent to which these [additional] limitations erode the unskilled light occupational base." (R. at 19-20). As such, there is no error here.

Plaintiff next asserts that the ALJ improperly assessed the opinion of treating physician Dr. Young. (ECF No. 7 at 11-18). If an ALJ does not give the treating physician's opinion controlling weight, then he is to consider the examining relationship, the treating relationship, supportability of the opinion afforded by medical evidence, consistency of opinion with the record as whole, specialization of the treating physician, and various other factors. 20 C.F.R. §§ 404.1527(c), 416.927(c). Plaintiff asserts that the ALJ gave Dr. Young's opinion "little weight," but this is factually incorrect. (ECF No. 7 at 11-12). The ALJ considered Dr. Young's opinion that it would be "reasonable to conclude...that [Plaintiff] would have difficulty doing continuous, prolonged weight bearing activity," and determined that it was "not inconsistent" with his assessment of Plaintiff's RFC, allowing Plaintiff to sit *or* stand whenever she chooses. (R. at 18, 271). The vocational expert testified that such an option would allow Plaintiff to accomplish all of her work while sitting, and therefore, Plaintiff would not be "doing continuous, prolonged weight bearing activity." (R. at 66-67). In sum, the ALJ never assigned "little weight" to Dr. Young's opinion, and his assessment of the same was not error.

Plaintiff next argues that the ALJ erred by improperly assessing Plaintiff's credibility. When assessing a claimant's credibility regarding the intensity and persistence of her symptoms, an ALJ must compare the claimant's subjective allegations of pain with the objective medical evidence. 20 C.F.R.§ 404.1529(c)(2). An ALJ must consider all the evidence before him and "must give some indication of the evidence which he rejects and his reason(s) for discounting such evidence." Russo v. Astrue, 421 F. App'x 184, 191 (3d Cir. 2011); Burnett v. Comm'r of Soc. Sec., 220 F. 3d 112, 122 (3d Cir. 2000). Reviewing courts "ordinarily defer to an ALJ's credibility determination because he or she has the opportunity at a hearing to assess the witness's demeanor." Reefer v. Barnhart, 326 F.3d 376, 380 (3d Cir. 2003).

The ALJ properly highlighted numerous inconsistent statements made by Plaintiff. He discussed Plaintiff's testimony that no treatment helped, she was never pain free, and her knees always hurt to some extent. (R. at 18, 48-49, 53-54). However, her medical records show that on various dates she reported she was "100% better and pain free" and had "a great deal of help" from the injections. (R. at 170, 178). Additionally, Plaintiff had reported to her physicians that her medication was helping her. (R. at 18, 191, 272). The ALJ referred to one of Plaintiff's physical therapy records, where she reported that on June 9, 2009, she was "feeling pretty good," and noted "that despite [Plaintiff's] allegations of disabling levels of pain, her pain is well controlled with non-narcotic medications," (R. at 18, 219). The ALJ also discredited Plaintiff because her medical records provide that on her five day vacation she rode a bicycle, which she reported helped her knees, but at the hearing she did not remember ever riding the bicycle. (R. at 18, 54-55, 218). The ALJ questioned how Plaintiff was able to do activities like gardening if her pain was so severe that three days per week her pain was at a level of ten out of ten. (R. at 18, 55, 58-59, 217). The ALJ found that Plaintiff's initial denial in response to the question at

21

the hearing of whether she was ever instructed that she walk for exercise diminished her credibility as well. (R. at 17, 49-50, 272).

While much of the ALJ's discussion of evidence tending to diminish Plaintiff's credibility is generally appropriate, the ALJ erred by failing to affirmatively consider Plaintiff's long work history. (ECF No. 7 at 17). When making a credibility assessment, an ALJ's failure to consider a plaintiff's long work history constitutes justification for a remand when that plaintiff has "also showed evidence of severe impairments or [has] attempted to return to work." Corley v. Barnhart, 102 F. App'x 752, 755 (3d Cir. 2004) (citing Dobrowolsky v. Califano, 606 F.2d 403, 405, 410 (3d Cir. 1979)); *see also* Sementilli v. Astrue, 2010 WL 521183, *8 (W.D. Pa. 2010); Bond v. Astrue, 2011 WL 710207, *14 (W.D. Pa. 2011); Sopher v. Astrue, 2011 WL 3444158, *14 (W.D. Pa. 2011). In this case, Plaintiff worked for the U.S. Post Office from 1986 to 2009 and testified that she was fired from her job as a supervisor because of problems with her knees. (R. at 42, 45-46). Plaintiff did not feel her termination was justified, and the ALJ concluded that "[b]y definition, if the claimant did not feel that she should have been fired, then she asserted that she was able to perform the work which was light in exertion." (R. at 18, 46-47). It is error when "the ALJ [does] not discuss the Plaintiff's long work history in the context of his overall credibility determination and only mention[s] [her] unsuccessful attempts to return to work as circumstantial evidence of an ability to perform work of a less demanding nature." Sementilli, 2010 WL 521183, *8. Here, Plaintiff testified that she was unable to complete the work as a supervisor, which required prolonged standing. (R. at 46-47). She attempted to return to work by asking about the possibility of working only two to three days per week. (R. at 46-47). The ALJ should have actually considered her long work history as a factor when assessing her credibility instead of flatly stating that Plaintiff's disagreement with the decision to terminate her was an assertion she could perform light work, since it also reflects her effort to return to her

position. Vacation and remand is appropriate here so that the Plaintiff's long work history can be affirmatively considered and discussed in the context of the overall credibility analysis of Plaintiff.

Finally, Plaintiff argues that ALJ's errors resulted in an improper hypothetical question posed to the vocational expert. (ECF No. 7 at 18). "The ALJ must accurately convey to the vocational expert all of a claimant's *credibly established limitations*." Rutheford v. Barnhart, 399 F.3d 546, 554 (3d Cir. 2005)(citing and adding emphasis to Plummer v. Apfel, 186 F.3d 422, 431 (3d Cir. 1999)). Because the Court finds that the ALJ erred in assessing Plaintiff's credibility with respect to her long work history, this is an argument that can and must be considered anew on remand.

## V.  CONCLUSION

Based on the foregoing, the Plaintiff's Motion for Summary Judgment is GRANTED in part and is DENIED in part, and Defendant's Motion for Summary Judgment is DENIED, and the decision of the ALJ is VACATED and the matter REMANDED to the Commissioner for further proceedings not inconsistent with this Opinion. An appropriate order follows.

Mark R. Hornak
United States District Judge

Dated: December *18*, 2013

cc:  All counsel of record